## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

| | |
|---|---|
| STEVE FIFIELD, individually on behalf of all others similarly situated, | No. 2:12-CV-00091-WKS |
| Plaintiff, | |
| vs. | |
| GREEN MOUNTAIN COFFEE ROASTERS, INC., *et al.,* | |
| Defendants. | |

## DEFENDANT GREEN MOUNTAIN COFFEE ROASTERS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS <u>THE AMENDED COMPLAINT</u>

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND.............................................................................................4

    A.    Green Mountain's Business and Substantial Growth**Error! Bookmark not defined.**

    B.    Green Mountain's First Quarter Fiscal 2012 Earnings Release and Disclosure of the Need to Monitor and Revisit Its Forecasting Model............................................................**Error! Bookmark not defined.**

    C.    Green Mountain's Release of Second Quarter 2012 Earnings and Revisions to Annual Forecasts........................**Error! Bookmark not defined.**

    D.    Plaintiffs' Amended Complaint......................**Error! Bookmark not defined.**

ARGUMENT.....................................................................................................................11

I.    THE AMENDED COMPLAINT FAILS TO ALLEGE A FALSE STATEMENT OR OMISSION OF MATERIAL FACT .........................................11

    A.    The Amended Complaint's Alleged Misstatements Are Not Actionable Because They Are Forward-Looking and Are Accompanied By Meaningful Cautionary Language**Error! Bookmark not defined.**

    B.    The Amended Complaint Otherwise Fails to Allege Any False Statement .................................................................................................15

II.    THE AMENDED COMPLAINT FAILS TO PLEAD THE STRONG AND COMPELLING INFERENCE OF SCIENTER TELLABS REQUIRES ...............................................................................................................17

    A.    Plaintiffs' Stock Sale Allegations Do Not Reveal Any Motive To Defraud ..................................................................................................19

    B.    The Amended Complaint's Confidential Witness Statements Regarding Inventory and Demand Planning Fail to Support an Inference of Scienter as to Missed Financial Forecasts................................23

    C.    The Opposing Inference of Innocent Conduct Is Far More Cogent and Compelling................................................................................................27

CONCLUSION..................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995)......................................................................... 16, 23

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)....................................................................... 11, 16

*Campo v. Sears Holdings Corp.*,
    371 F. App'x 212 (2d Cir. 2010) ................................................................... 27

*Campo v. Sears Holdings Corp.*,
    635 F. Supp. 2d 323 (S.D.N.Y. 2009)......................................................... 24

*City of Roseville Emps. Ret. Sys. v. Nokia Corp.*,
    No. 10 CV 00967, 2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) ............................. 14

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*,
    655 F. Supp. 2d 262 (S.D.N.Y. 2009)......................................................... 16

*Coates v. Heartland Wireless Commc'ns, Inc.*,
    26 F. Supp. 2d 910 (N.D. Tex. 1998) ......................................................... 22

*Fishbaum v. Liz Claiborne, Inc.*,
    No. 98-9396, 1999 WL 568023 (2d Cir. July 27, 1999).......................................... 20

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010)......................................................... 14

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................... 19, 20

*Glickman v. Alexander & Alexander Servs., Inc.*,
    No. 93 Civ. 7594, 1996 WL 88570 (S.D.N.Y. Feb. 29, 1996) ................................. 27

*Hershfang v. Citicorp*,
    767 F. Supp. 1251 (S.D.N.Y. 1991)............................................................ 27

*In re Ashanti Goldfields Sec. Litig.*,
    184 F. Supp. 2d 247 (E.D.N.Y. 2002) ......................................................... 13

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004).......................................................... 23

*In re Bausch & Lomb, Inc. Sec. Litig.*,
 592 F. Supp. 2d 323 (W.D.N.Y. 2008) ....................................................................... 22

*In re Corning Sec. Litig.*,
 No. 01-CV-6580, 2004 WL 1056063 (W.D.N.Y. Apr. 9, 2004) .............................. 12

*In re Gildan Activewear, Inc. Sec. Litig.*,
 636 F. Supp. 2d 261 (S.D.N.Y. 2009) ........................................................... 18, 19, 20

*In re IAC/InterActiveCorp Sec. Litig.*,
 478 F. Supp. 2d 574 (S.D.N.Y. 2007) ................................................................ 12, 21

*In re Openwave Sys. Sec. Litig.*,
 528 F. Supp. 2d 236 (S.D.N.Y. 2007) ....................................................................... 22

*Iowa Pub. Emps. Ret. Sys. v. MF Global, Ltd.*,
 620 F.3d 137 (2nd Cir. 2010) .................................................................................... 12

*Lasker v. N.Y. State Elec. & Gas Corp.*,
 85 F.3d 55 (2d Cir. 1996) ........................................................................................... 13

*Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*,
 No. 11 Civ. 398, 2012 WL 4616958 (S.D.N.Y. Sept. 28, 2012) .............................. 27

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
 724 F. Supp. 2d 447 (S.D.N.Y. 2010) ....................................................................... 26

*McKenna v. SMART Techs., Inc.*,
 No. 11 Civ. 7673, 2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012) .................... 17, 25, 27

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000) .................................................................................. 3, 24

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of
 Commerce*,
 694 F. Supp. 2d 287 (S.D.N.Y. 2010) ....................................................................... 26

*Police & Fire Ret. Sys. v. Safenet, Inc.*,
 645 F. Supp. 2d 210 (S.D.N.Y. 2009) ....................................................................... 27

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004) ................................................................................. 11, 13

*Rothman v. Gregor*,
 220 F.3d 81 (2d Cir. 2000) ................................................................................... 19, 20

*Russo v. Bruce*,
 777 F. Supp. 2d 505 (S.D.N.Y. 2011) ....................................................................... 21

iii

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Phillip Morris Cos., Inc.*,
  75 F.3d 801 (2d Cir. 1996)...................................................................... 23

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)............................................................... *passim*

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
  531 F.3d 190 ........................................................................................ 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................ *passim*

*Tyler v. Liz Claiborne, Inc.*,
  814 F. Supp. 2d 323 (S.D.N.Y. 2011)...................................................... 19

*Warchol v. Green Mountain Coffee Roasters, Inc.*,
  No. 2:10-cv-227, 2012 WL 256099 (D. Vt. Jan. 27, 2012) ................... *passim*

*Weiss v. Amkor Tech., Inc.*,
  527 F. Supp. 2d 938 (D. Ariz. 2007) ...................................................... 25

**STATUTES**

15 U.S.C. § 78u-4(b)........................................................................ *passim*

15 U.S.C. § 78u-5(c) .................................................................... 12, 13, 18

15 U.S.C. § 78u-5(i)................................................................................ 12

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b5-1....................................................................... 20

Fed. R. Civ. P. 9(b) ....................................................................... *passim*

Defendant Green Mountain Coffee Roasters, Inc. ("Green Mountain" or the "Company") respectfully submits this memorandum in support of its motion to dismiss the Amended Class Action Complaint (the "Amended Complaint" or "AC") filed by lead plaintiffs Kambiz Golesorkhi and William C. Daley (collectively, "Plaintiffs").[1]

## PRELIMINARY STATEMENT

As the Court is already familiar, Green Mountain is a Vermont-based leader in the specialty coffee and coffee maker businesses that has grown tremendously in recent years with the success of its popular Keurig single-cup brewing system.  In disclosing its second quarter fiscal 2012 results on May 2, 2012, Green Mountain announced that its sales growth for the quarter fell short of the estimates the Company had put forward when announcing its first quarter results on February 1, 2012.  Though Green Mountain's second quarter non-GAAP earnings per share ("EPS") of $0.64 was at the high end of the range the Company had projected, Green Mountain's sales growth was 37% in comparison to the prior year's quarter, short of the net sales growth of 45–50% the Company previously had estimated.  In response to this net sales miss, Green Mountain lowered its projections for annual net sales and non-GAAP EPS for fiscal 2012. Unsurprisingly, the Company's share price dropped following the May 2 earnings announcement.

Plaintiffs filed this action on May 7, 2012, a mere five days after Green Mountain announced its financial results for the second quarter of the 2012 fiscal year.  Plaintiffs' Amended Complaint is premised entirely on forward-looking statements.  Plaintiffs do not

---

[1] The other defendants in this action are Robert P. Stiller, Lawrence J. Blanford, and Frances G. Rathke (together, the "Individual Defendants"). During the Class Period, Mr. Stiller was Green Mountain's founder and Board chairman, Mr. Blanford was its chief executive officer, and Ms. Rathke was its chief financial officer.  AC ¶¶ 46–48.  The Individual Defendants have filed supplemental briefs in support of their motions to dismiss, and Green Mountain incorporates by reference the arguments set forth in those briefs.

challenge the Company's financial reporting during the Class Period as either false or misleading.  Instead, Plaintiffs claim that the Company's financial forecasting was flawed, and that supposed flaw was somehow known to the Company when it provided financial forecasts for the second quarter of fiscal 2012 as well as the full 2012 fiscal year in its February 1, 2012 earnings press release.  Plaintiffs ignore, however, language in the press release and associated earnings call specifically cautioning investors that there were uncertainties associated with estimating sales due to the rapid trajectory of the Company's growth, and that the Company planned to continue to monitor and refine its financial forecasting model over the coming months.  The mere existence of such cautionary statements renders the financial forecasts alleged to be false inactionable as a matter of law under the Private Securities Litigation Reform Act's ("PSLRA") forward-looking statement safe-harbor and the bespeaks caution doctrine embraced by the Second Circuit.

The federal securities laws require far more than the mere fact of a missed projection to state a claim for securities fraud.  As this Court has recognized, Plaintiffs' claims are subject to "exacting" pleading standards.  *Warchol v. Green Mountain Coffee Roasters, Inc.*, No. 2:10-cv-227, 2012 WL 256099, at *4 (D. Vt. Jan. 27, 2012).  First, under the PSLRA and Fed. R. Civ. P. 9(b), Plaintiffs are required to identify *specific* statements and to explain "the reason or reasons why [each] statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Second, Plaintiffs' allegations must be sufficient to raise a "strong inference" of scienter, which the Supreme Court has held must be not merely plausible, but "cogent and compelling," and at least as compelling as any non-fraudulent inference.  15 U.S.C. § 78u-4(b)(2)(A); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  The Amended Complaint fails to satisfy the applicable standards for either of these elements.

<u>First</u>, Plaintiffs allege that Defendants "must have" misrepresented Green Mountain's prospects for future sales growth because the Company eventually fell short of its financial projections. Such pleading of "fraud by hindsight" cannot make out a claim for securities fraud. And, regardless, financial projections are inactionable under the federal securities laws where, as here, such forward looking statements are accompanied by meaningful cautionary language. Green Mountain's financial forecasts for its second quarter and fiscal year 2012 were disclosed as estimates—*not guarantees*—and therefore cannot form the basis for a securities fraud action.

<u>Second</u>, Plaintiffs do not allege specific facts that give rise to the requisite "strong inference" of scienter. *See* 15 U.S.C. § 78u-4(b)(2). Importantly, where a claim is based upon forward-looking statements, the PSLRA requires more than allegations of conscious recklessness. Instead, Plaintiffs must plead a strong inference that Defendants had *actual knowledge* that the challenged statement was false and misleading when it was made. *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010). The Amended Complaint comes nowhere close to satisfying this burden. Plaintiffs' confidential witnesses fail to identify any information known to the Individual Defendants at the time of the alleged misstatements in February 2012 that would have contradicted the Company's financial projections for the rest of the year. Nor does the Amended Complaint plead any facts, let alone with sufficient particularity, to suggest a *probability* that confidential witnesses would possess an understanding of enterprise-level financial forecasting. *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). Not one of the confidential witnesses was at the Company during the Class Period, so they are in no position to provide any information at all to advance Plaintiffs' claims. Moreover, it borders on the absurd to suggest that three confidential witnesses whose alleged responsibilities were limited to production planning at a single business unit could opine on processes used to generate

enterprise-wide financial estimates.

In an unsuccessful attempt to raise some inference of scienter, Plaintiffs resort to untenable motive allegations by pointing to sales of Green Mountain stock by two Individual Defendants, Mr. Stiller and Mr. Blanford, in February 2012.  In the Second Circuit, it is well-established that insider stock sales, standing alone, do not give rise to a compelling inference of scienter.  This is particularly true where, as here, defendants Blanford and Rathke actually *increased* their total holdings in Green Mountain stock during the Class Period, and no other Company insider is alleged to have sold shares during that time.  Moreover, the sales by Messrs. Stiller and Blanford constituted a small percentage of their overall holdings, and Mr. Blanford's sale was made pursuant to a Rule 10b5-1 trading plan entered into before the Class Period, which the Second Circuit has held undermines any inference of scienter.  Lastly, as to Mr. Stiller, Plaintiffs' allegations are nonsensical because the motive Plaintiffs suggest has nothing to do with to the "hidden" fraud they claim in the Amended Complaint.  Plaintiffs speculate that Mr. Stiller sold the shares shortly before one of Green Mountain's competitors, Starbucks, announced its plans to introduce an espresso brewer system, *not* that his sales were supposedly made ahead of some imminent disclosure that Green Mountain had not met its estimates.  In sum, these motive allegations fail to raise any inference that any Defendant had actual knowledge the financial projections the Company made in February 2012 were false.

## FACTUAL BACKGROUND

The allegations of the Amended Complaint, supplemented with information from documents that Plaintiffs rely on in that complaint or that have been publicly filed, are summarized below.[2]

---

[2] On a motion to dismiss, the Court may properly consider documents relied upon or integral to the complaint, as well as publicly filed documents.  *See*, *e.g.*, *Tellabs*, 551 U.S. at 322.

A.      **Green Mountain's Business and Substantial Growth**

Green Mountain is a public company based in Waterbury, Vermont that employs approximately 5,800 employees.  Declaration of Michael J. Vito ("Vito Decl."), filed herewith, Ex. 1 at 2, 7 (2012 Form 10-K dated Nov. 28, 2012).  The Company is a leader in the specialty coffee and coffeemaker businesses recognized for innovative brewing technology, including its Keurig® single-cup brewing system, which uses K-Cup® portion packs of coffee, tea, and other beverages.  AC ¶ 3; Vito Decl. Ex. 1 at 1.

This Court is familiar with Green Mountain's business, most notably the Company's substantial growth in recent years.  As exhibited by the chart below, annual net sales at Green Mountain have almost tripled between fiscal year 2010 and fiscal year 2012, from approximately $1.4 billion to $3.9 billion.[3]  Vito Decl. Ex. 1 at 31.



---

[3] The quarterly net sales numbers present in the chart above are derived from Green Mountain's Form 10-K filings for 2010 and 2012.  Vito Decl. Ex. 1 at 85; Vito Decl. Ex. 2 at F-50 (2010 Form 10-K dated Dec. 9, 2010).

In this same three year interval, the Company essentially doubled both its workforce and the size of its manufacturing facilities.  *Compare* Vito Decl. Ex. 1 at 7, 18 *with* Vito Decl. Ex. 2 at 9, 20. By 2012, the Company had expanded to include three business units, the Specialty Coffee Business Unit, the Keurig Business Unit, and the Canadian Business Unit, all of which were responsible for sales to multiple channels of distribution.  AC ¶ 3; Vito Decl. Ex. 1 at 5.

### B. Green Mountain's First Quarter Fiscal 2012 Earnings Release and Disclosure of the Need to Monitor and Revisit Its Forecasting Model

Consistent with its customary practice, in the February 1, 2012 press release announcing the Company's first quarter results for fiscal 2012, Green Mountain provided estimates of net sales growth (as compared to the prior year) and non-GAAP EPS for both the second quarter and entire fiscal year of 2012.  AC ¶ 37; Vito Decl. Ex. 3 at 3 (Feb. 1, 2012 Earnings Release). These estimates were presented in a section captioned "Business Outlook and Other Forward-Looking Information," with cautionary language describing a variety of factors that could cause actual results to differ materially from those projected.  *Id*. at 3–4.  This cautionary language warned investors that such factors included, among others, "the difficulty in forecasting sales and production levels, [and] the degree to which there are changes in consumer sentiment in this difficult economic environment."  *Id.* at 4.  On February 21, 2012, Ms. Rathke referred to those same annual net sales growth and non-GAAP EPS estimates from the February 1, 2012 press release during a presentation at the Consumer Analyst Group of New York Conference ("CAGNY").  *See* AC ¶ 55.  The estimates reiterated in Green Mountain's CAGNY presentation again were identified as forward-looking and accompanied by the same cautionary language.[4]

---

[4] Consistent with the February 1, 2012 release, at the CAGNY conference the Company described forecasted information as "estimates" and provided cautionary language in accompanying slides.  Vito Decl. Ex. 4 at 2:21–3:2, 24:20–22, 26:6–8 (transcript from audio recording of Feb. 21, 2012 CAGNY conference, available at http://investor.gmcr.com/events.cfm (last visited Jan. 16, 2013)); Vito Decl. Ex. 5 at 2, 39–40 (Feb. 21, 2012 CAGNY slides,

Green Mountain's financial forecasts for the second quarter and fiscal year 2012 moderated expectations after a first quarter holiday season whose actual results exceeded both the Company's forecasted sales and projected non-GAAP EPS growth, by more than 10% and 33%, respectively. *See* Vito Decl. Ex. 3 at 1; Vito Decl. Ex. 6 at 4 (Nov. 9, 2011 Earnings Release). Despite exceeding estimates for the first quarter, Green Mountain issued second quarter estimates that assumed "lower portion pack and brewer growth rates compared to its first quarter fiscal year 2012," anticipating a dip in demand following holiday season purchases and due to "the established seasonality of the business." Vito Decl. Ex. 3 at 3. The Company also reaffirmed its prior estimates for the entire 2012 fiscal year. In issuing its financial projections, Green Mountain did not simply rely upon *pro forma* warnings, but rather specifically spoke about factors that exacerbated forecasting challenges. For example, Mr. Blanford cautioned investors about "the challenge of estimating sales in such a dynamic environment" after having sold 4.3 million brewers in the first quarter of 2012, which represented "*more than half* of the 6.5 million brewers sold in all of [] fiscal year 2011." *Id.* (emphasis added). Mr. Blanford also advised investors that "in the coming months" Green Mountain would be "confirm[ing] and refin[ing] [its] modeling assumptions and estimates" to evaluate how unexpected brewer sales would influence sales of K-Cup® portion packs. *Id.*; AC ¶ 51.

During the first quarter 2012 earnings call, Mr. Blanford reiterated the caution expressed in the press release when an analyst suggested the Company's financial forecasts appeared to be conservative in light of large increases in brewer sales. Vito Decl. Ex. 7 at 7–8 (Feb. 1, 2012 Earnings Call Transcript). Mr. Blanford responded that the Company was confident in the

---

available at http://investor.gmcr.com/events.cfm (last visited Jan. 16, 2013)). Cautionary statements made clear that the Company "does not undertake to revise [forecasts] to reflect subsequent developments, other than in its regular, quarterly earnings releases." Vito Decl. Ex. 5 at 2.

predictive ability of its forecasting model "as we back-check it in '10, '11," but cautioned that the number of brewers sold in the first quarter was "very significant relative to the installed base and relative to what [Green Mountain] sold last year." *Id*. at 7–8. As a result, Mr. Blanford explained that Green Mountain needed "the benefit of some time here over the next couple of months with our survey efforts to make sure that we confirm and or refine, if necessary, the assumptions in our model, just because of the incremental growth we are seeing." *Id.* at 8.

### C.    Green Mountain's Release of Second Quarter 2012 Earnings and Revisions to Annual Forecasts

On May 2, 2012, Green Mountain announced its second quarter financial results. Vito Decl. Ex. 8 at 1 (May 2, 2012 Earnings Release). The Company's $885.1 million in net sales for the quarter fell short of the quarterly estimates issued on February 1, 2012 by approximately $54 million, a mere 6% of the total net sales generated in the quarter. *Id*. Yet even with lower than expected net sales, Green Mountain's $0.64 non-GAAP EPS comfortably fell within the $0.60–$0.65 range the Company had predicted. *Id*.; Vito Decl. Ex. 3 at 3. Although the net sales miss was modest, the Company observed that it had experienced "lower-than-anticipated portion pack sales, and to a lesser degree, brewer sales, in the quarter" and revised its annual forecasts to reflect this trend.[5] AC ¶ 57; Vito Decl. Ex. 8 at 1, 3.

During the Company's second quarter earnings call, Mr. Blanford explained that brewer and K-Cup® portion pack sales may have been lower than expected for many of the reasons the Company warned investors about during the February 1 earnings call. *See infra* at 13–14. In particular, Mr. Blanford stated that brewer sales growth slowed at least in part due to "a better in-

---

[5] Green Mountain forecasted annual net sales growth of 45%–50%, previously expected to be in the range of 60%–65%. Vito Decl. Ex. 1 at 3; Vito Decl. Ex. 8 at 3. In addition, the Company predicted non-GAAP EPS of $2.40–$2.50, previously expected to be in the range of $2.55–$2.65. *Id*.

stock inventory position coming into and through the important 2011 holiday season compared to prior years," resulting in less restocking demand than in prior years.  Vito Decl. Ex. 9 at 3 (May 2, 2012 Earnings Call Transcript).  Mr. Blanford also explained that "unseasonably warm weather experienced in many parts of the US adversely affected sales of [] seasonal beverages such as hot cocoa and hot apple cider."  *Id*.

Also during the earnings call, Mr. Blanford informed analysts that Green Mountain had not determined whether the moderation in K-Cup® portion pack growth in the quarter was indicative of an emerging growth plateau.  *Id*. at 9–10, 13–14.  He explained that the Company was performing a review of customer consumption patterns, channel shifts, trade inventory levels, and customer and partner ordering patterns to make refinements to its portion pack sales estimates.  *Id*. at 3.  Given Green Mountain's "dynamic business," Mr. Blanford expressed the need for a thorough analysis:

> I just don't want to go out and communicate that we understand it,
> and then a quarter from now have to change that. We're working to
> try to understand it.  I think we feel very good about the brewers
> sold, the sell-through and how they're moving in the installed base
> and that installed base keeps growing.

*Id*. at 3, 14.  By the close of the following quarter, Green Mountain had concluded that the disconnect between the reported results and financial projections "was not due to changes in fundamental consumer behavior."   Vito Decl. Ex. 10 at 3 (Aug. 1, 2012 Earnings Call Transcript).  Rather, the Company explained that its prior forecasting methodology required revision to reflect the evolving maturity of Green Mountain's business.  *Id*.  Specifically, on the third quarter earnings call, Ms. Rathke described that the Company's forecasting model, based on a "bottoms up" sales forecast and a "higher level" estimate applying a "single-serve pack shipment factor . . . informed by [] consumer surveys" to the brewer installed base, had been accurate over prior quarters because it captured "sellthrough demand" to end consumers as well

as "distribution gains" to retail, grocery and other customers. *Id.* at 4. Second quarter results, however, indicated that distribution gains were beginning to slow as the Company's market penetration increased. *Id.* Ms. Rathke explained that Green Mountain's refined financial forecasting model looks to data on "point of sale transactions," among other factors, to better predict portion pack sell-through. *Id.*

### D.   Plaintiffs' Amended Complaint

The Amended Complaint identifies two allegedly false and misleading statements during the Class Period, both of which pertain to predictions of Green Mountain's future performance. AC ¶¶ 51, 55. First, Plaintiffs challenge the Company's reaffirmation of annual revenue and earnings estimates in the February 1, 2012 earnings release. AC ¶ 51. Second, Plaintiffs cite Ms. Rathke's reference to those same forecasts during the CAGNY presentation. AC ¶ 55. Plaintiffs allege both statements were "materially false and/or misleading when made because Defendants failed to disclose that: (i) demand for the Company's brewers and portion packs had slowed; (ii) the Company's models for predicting demand were flawed and ineffective; and (iii) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects." AC ¶¶ 52, 56.

Plaintiffs do not assert that Green Mountain misstated its financial results during the Class Period. Plaintiffs instead seek to show supposed flaws in the Company's financial forecasting with reference to confidential witnesses who left the Company months, if not years, prior to the Class Period and who opine on internal demand planning systems and inventory levels at one business unit. *See, e.g.,* AC ¶¶ 12, 17, 18, 25, 28, 30–34. Nowhere in the Amended Complaint do Plaintiffs allege how such confidential witness allegations have any bearing on Green Mountain's development of quarterly or annual enterprise-wide forecasts that were disclosed to investors. Nor do Plaintiffs allege any basis from which to infer that confidential

witnesses had any knowledge about, or insight into, Green Mountain's enterprise-wide financial forecasting or accounting functions.  Rather, Plaintiffs acknowledge that all three confidential witnesses worked at the Company's Specialty Coffee Business Unit.  AC ¶¶ 11, 20, 26–27.

## ARGUMENT

## I.    THE AMENDED COMPLAINT FAILS TO ALLEGE A FALSE STATEMENT OR OMISSION OF MATERIAL FACT

### A.    The Amended Complaint's Alleged Misstatements Are Not Actionable Because They Are Forward-Looking and Are Accompanied By Meaningful Cautionary Language

To state a viable claim under Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5, a complaint alleging material misstatements must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).  Rule 9(b) demands that "a party must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  Congress added further pleading burdens when it passed the PSLRA in 1995 in an effort to curtail meritless securities litigation. *See Tellabs,* 551 U.S. at 313.  The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1). Allegations that are conclusory or unsupported by factual assertions are insufficient.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

Moreover, the PSLRA established a safe harbor for forward-looking statements, which are not actionable if "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking

statement."  15 U.S.C. § 78u-5(c).  The PSLRA defines forward-looking statements broadly for the purposes of this safe harbor and includes statements precisely of the type alleged to be misleading here, those "containing a projection of revenues (including income loss) [or] earnings (including earnings loss) per share."  15 U.S.C. § 78u-5(i).  The Second Circuit's "bespeaks caution" doctrine similarly provides that forward-looking statements are not actionable when "accompanied by sufficient cautionary language," because "no reasonable investor could have found the statement materially misleading."  *Iowa Pub. Emps. Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2nd Cir. 2010).  "The securities laws do not require that investors be treated like children . . . investors know that the stock market is a risky business and that when a company's officer makes predictions . . . they are not issuing guarantees."  *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 587 (S.D.N.Y. 2007).

*Significantly, Plaintiffs do not allege any misstatements as to Green Mountain's reported financial results during the Class Period.*[6]  Instead, the two February 2012 statements Plaintiffs

---

[6] Elsewhere, the Amended Complaint suggests, based solely on confidential witness accounts, that write-offs of expired product allegedly were "delaye[d] . . . past quarter ends," and that the Company's publicly-reported inventory figures were inaccurate because they supposedly included expired product.  AC ¶¶ 26–29, 30–34.  CW3 also claims to have left the Company in April 2010 supposedly because she was asked to "break the rules regarding quarterly revenue recognition."  AC ¶ 29.  Nowhere do Plaintiffs actually allege that there was any material misstatement in Green Mountain's financial results during the Class Period, including in its accounting for inventory, its reserves for expired product, or its revenue recognition accounting. Moreover, Plaintiffs' confidential witness accounts are so generalized as to be meaningless, as they do not specify relevant time periods, the type of product involved, or what effect, if any, the conduct the "witnesses" allege had on Green Mountain's Class Period financials.  Plaintiffs' confidential witnesses, who are not alleged to have any involvement with Green Mountain's accounting functions either at the business unit or at the enterprise level, simply could not supply any particularized information as to how the Company accounted for inventory and revenue. These broad and sweeping generalities fail to satisfy Rule 9(b) and the PSLRA.  *See, e.g., In re Corning Sec. Litig.*, No. 01-CV-6580, 2004 WL 1056063, at *5 (W.D.N.Y. Apr. 9, 2004) (claim based on excess inventory or obsolescence requires some indication of the value of "the allegedly obsolete inventory," so that it can be compared "to the overall value of [the company's] inventory").

challenge as false—those where the Company provided sales and earnings guidance for the coming quarter and reaffirmed its guidance for the fiscal year—are classic forward-looking statements.[7]  *See* AC ¶¶ 51, 55.  Net sales and non-GAAP EPS projections are, by their very nature, statements "whose truth cannot be ascertained until some time after the time they are made" and in fact are specifically enumerated as forward-looking in the safe harbor.  *In re Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247, 266 (E.D.N.Y. 2002); 15 U.S.C. § 78u-5(c) (listing "projection of revenues (including income loss) [or] earnings (including earnings loss) per share" as among those statements qualifying as forward-looking for purposes of the PSLRA safe harbor).  As such, both the Second Circuit's bespeaks caution doctrine and the PSLRA immunize these statements from liability provided they were accompanied by meaningful cautionary language.  *See* 15 U.S.C. § 78u-5(c); *Rombach*, 355 F.3d at 173 ("[A]lleged misrepresentations . . . are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.").

To qualify under the PSLRA's safe harbor, cautionary language "need not include a particular factor that ultimately causes its projection not to come true."  *Slayton*, 604 F.3d at 773.  Rather, the statements must only identify "important factors that could realistically cause results to differ materially."  *Id*.  Green Mountain's cautionary language, however, directly warned investors of the principal risk that materialized here, that results could vary due to "the difficulty in forecasting sales and production levels" in a business experiencing volatile growth.  Vito Decl.

---

[7] Plaintiffs also conclusorily allege that Mr. Blanford's February 1, 2012 statement that the Company "will be working . . . to confirm and refine modeling assumptions and estimates of forward demand" was false when made.  AC ¶¶ 51–52.  Such statements of intention are inactionable as puffery.  *See, e.g., Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 58–59 (2d Cir. 1996).  Moreover, Mr. Blanford's statement serves as part of the cautionary language that renders Green Mountain's forward-looking predictions inactionable.  *See infra* at 14.

Ex. 3 at 4; Vito Decl. Ex. 5 at 2.   Indeed, at the outset of the alleged Class Period, Green

Mountain cautioned the market that it would need to continue to observe sales trends before it

could fully predict how recent, unexpectedly large increases in brewer sales would impact future

sales of K-Cup® portion packs.   *See supra* at 7–8.   The Company also expressly identified at the

start of the alleged Class Period other risks, including possible changes in consumer sentiment,

existing retailer shortfalls, and negative impacts of weather on sales, that in hindsight it

recognized had contributed to the missed financial forecasts in the second quarter.   *See* Vito Decl.

Ex. 3 at 4; *supra* at 8–9.

Green Mountain's extensive cautionary language, addressing both general market

conditions and company-specific factors that could impact rapid growth and thereby make it

difficult to forecast future financial results, was sufficient to invoke both the PSLRA's safe

harbor and the bespeaks caution doctrine.   *See*, *e.g.*, *City of Roseville Emps. Ret. Sys. v. Nokia

Corp.*, No. 10 CV 00967, 2011 WL 7158548, at *5 (S.D.N.Y. Sept. 6, 2011) (due to "substantive

and company-specific disclosures," the court held that "[n]o reasonable investor could have been

misled . . . into thinking that the risks of new products delays and competitive markets did not

actually exist or could not have adverse effects on Nokia's financial results") (citation omitted);

*see also Gissin v. Endres*, 739 F. Supp. 2d 488, 509–10 (S.D.N.Y. 2010) (cautionary statements

concerning "fluctuations in the price of corn," "expansion efforts," and "entry into high risk

accumulator contracts" rendered forward-looking statements at issue not actionable).   In total,

Green Mountain informed investors of more than fifty separate factors that could cause the

Company to miss its financial forecasts.   *See* Vito Decl. Ex. 11 (Compilation of Cautionary

Statements).   These factors included:

- "difficulty in forecasting sales and production levels";
- "success in efficiently expanding operations and capacity to meet growth";

- "sales mix variances";

- "weather and special or unusual events";

- "the Company's success in efficiently expanding operations and capacity to meet growth";

- "the Company's ability to continue to grow and build profits in the At Home and Away from Home businesses";

- "[possible] loss of, or a significant shortfall in demand from, [certain] retailers";

- "[risk that Green Mountain] may not be successful in developing innovative new products or [its] new products may not be commercially successful";

- "[the need to] effectively gauge the direction of [Green Mountain's] key marketplaces and successfully identify, develop, manufacture, market and sell new or improved products in these changing marketplaces";

- "[a]ny substantial or sustained decline in the acceptance of Keurig® single-cup brewing systems or sales of [its] K-Cup® portion packs";

- "[c]hanges in consumer tastes and preferences";

- "[n]ational, regional and local economic conditions";

- "[expiration of] patents associated with [the Company's] current generation K-Cup® portion packs presently used in Keurig brewers";

- "[possible need to] reduce the prices for some of [its] products to respond to competitive and customer pressures or to maintain [its] position in the marketplace";

- "[competition with] private label or generic products that generally are sold at lower prices";

- "[a]ny disruption in production or inability of [the Company's] manufacturer to produce adequate quantities to meet [its] needs"; and

- "[i]ncreases in the cost of high-quality Arabica coffee beans or cost of materials used to produce [the Company's] brewers [that] could reduce [its] gross margin and profit." *Id.*

### B.  The Amended Complaint Otherwise Fails to Allege Any False Statement

To satisfy the exacting pleading requirements of Rule 9(b) and the PSLRA, Plaintiffs must do more than rest on conclusory assertions that Green Mountain supposedly knew that its forecasts were too optimistic. Instead, Plaintiffs must specify as to each statement "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Nowhere do Plaintiffs allege anything about the circumstances they claim demonstrate the Company's February 2012

projections were false when made.  Plaintiffs point to the Company's public statements in connection with its second quarter earnings release as well as consequent analyst and stock price reaction as support for the notion that first quarter financial forecasts were false when made.  AC ¶¶ 57–59.  Courts, however, have long rejected such "fraud by hindsight" allegations as too generic to allege a false statement with the particularity required by applicable pleading standards.  *See, e.g., City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*, 655 F. Supp. 2d 262, 268 (S.D.N.Y. 2009) ("The securities laws do not provide a cause of action premised upon a hindsight review of faulty predictions as to business success."); *ATSI Commc'ns*, 493 F.3d at 103, 106 (Rule 9(b) and PSLRA not satisfied when a complaint "relies, at best, on speculative inferences" and offers "generalized allegations" as to wrongdoing).

At most, Plaintiffs point to a post-hoc statement by Mr. Blanford noting that financial forecasting has "gotten even more difficult to put our hands around"—*three months after* the financial projections that Plaintiffs challenge—to suggest the financial estimates the Company announced on February 1, 2012 "must have" been false when made.  AC ¶ 57–59.  As the Second Circuit has held, "[m]ere allegations that statements in one report should have been made earlier do not make out a claim of securities fraud."  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995).  Nor do Plaintiffs' confidential witness statements, which consist of conclusory claims that difficulties with "demand planning" were well known at the Company and that Green Mountain supposedly had difficulties with such planning because it used "antiquated software," bolster their complaint.  As discussed further below, *see infra* at 24–25, none of these supposed witnesses was with the Company during the Class Period.  *See* AC ¶ 11.  Beyond that, multiple other flaws plague their accounts, not the least of which is that Plaintiffs themselves identify the confidential witnesses as lower-level employees with operations responsibilities at a single

business unit.  The Amended Complaint provides no basis that would explain why confidential witness allegations from operations employees in a single business unit regarding supposed difficulties with demand planning could relate to external financial forecasts even during those witnesses' terms of employment, let alone after their departure.  *See McKenna v. SMART Techs., Inc.*, No. 11 Civ. 7673, 2012 WL 1131935, at *10–*13 (S.D.N.Y. Apr. 3, 2012) (concluding claim lacked the "hallmark specificity" required under Rule 9(b) where alleged failure to disclose a "precipitous decline in demand" was premised on confidential witnesses, without "plausible detail as to why individuals who held th[eir] positions would have any knowledge regarding . . . demand").  The Amended Complaint's failure to supply any particulars, including based on these confidential witnesses, as to how and why the challenged forecasts were false when made requires its dismissal.

## II.    THE AMENDED COMPLAINT FAILS TO PLEAD THE STRONG AND COMPELLING INFERENCE OF SCIENTER *TELLABS* REQUIRES

Plaintiffs also fail to satisfy the PSLRA's mandate that their complaint "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind," which is "an intent to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 314, 319 (emphasis added) (quoting 15 U.S.C. § 78u-4(b)(2) and *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 n.12 (1976)).  In *Tellabs*, the Supreme Court held that for an inference of scienter to qualify as "strong" as required by the PSLRA, it "must be more than merely plausible or reasonable—it must be cogent and *at least as compelling* as any opposing inference of nonfraudulent intent."  *Id.* at 315 (emphasis added).  The strength of the inference "cannot be decided in a vacuum," rather the court must "consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" and weigh all "nonculpable explanations for the defendant's conduct" against "the inferences urged by the

plaintiff." *Id.* at 322–24, 314.

Importantly, the PSLRA's safe harbor for forward-looking statements imposes an even higher scienter standard than applies where a plaintiff alleges a misstatement of current or historical fact.  Where a forward-looking statement is at issue, plaintiffs must allege that the "statement . . . was . . . made or approved by [an executive officer] with *actual knowledge* by that officer that the statement was false or misleading." *Slayton*, 604 F.3d at 773 (quoting 15 U.S.C. § 78u-5(c)(1)(B)).  The court must "assess all of the allegations holistically" to make a "practical judgment" as to whether it is "at least as likely as not" that defendants acted with "*actual subjective knowledge*" as to the alleged falsity of the forward-looking statements in question. *Id.* at 775, 776 & n. 9 (emphasis added).  Thus, contrary to Plaintiffs' suggestions in the Amended Complaint, they cannot allege a viable claim for fraud based on a conscious recklessness theory.  In this context, the PSLRA requires far more than an assertion that the Defendants "must have been aware," *see* AC ¶ 96, of facts rendering their forecasts false or misleading at the time they were made. *Slayton*, 604 F.3d at 776 & n. 9.

Entirely absent from the Amended Complaint are any allegations that would raise an inference of actual knowledge, either based on motive or circumstantial allegations.  Messrs. Stiller's and Blanford's stock transactions are not unusual or suspicious under any of the criteria recognized in this Circuit as sufficient to raise a scienter inference. *See In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 269–72 (S.D.N.Y. 2009).  And when a complaint challenges a forward-looking statement and the plaintiffs fail to allege motive, "their circumstantial evidence of actual knowledge must be correspondingly greater." *Slayton*, 604 F.3d at 776.  Plaintiffs' circumstantial allegations are based entirely upon reports from confidential witnesses who did not work at the Company during the Class Period, who are not

identified to have had any involvement in or even insight into financial forecasting for the Green Mountain enterprise, and who do not allege any specific contrary information known to the Individual Defendants. Further, the Amended Complaint itself raises a compellingly strong non-culpable inference—namely, that Green Mountain simply experienced difficulties with scaling its financial forecasting model due to the rapid growth of its business and concurrent changes in customer purchasing patterns.

A.   **Plaintiffs' Stock Sale Allegations Do Not Reveal Any Motive To Defraud**

Plaintiffs' allegations regarding stock sales by Defendants Blanford and Stiller fail to show how such sales are "unusual or suspicious" so as to raise any inference of scienter. *See Gildan*, 636 F. Supp. 2d at 270. In determining whether insider stock sales are "unusual or suspicious," courts consider factors such as the amount of net profit from the sales, the portion of holdings sold, the change in volume of insider sales, the number of insiders selling, and whether sales were made pursuant to predetermined trading plans. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 94–95 (2d Cir. 2000); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011); *Gildan*, 636 F. Supp. 2d at 270–72. A trade may be considered "unusual" only if it occurs "in amounts dramatically out of line with prior trading practices and at times calculated to maximize personal benefit from undisclosed inside information." *Warchol*, 2012 WL 256099, at *7 (internal quotation marks and citations omitted). Plaintiffs are required to "allege not only the insider defendants' selling activity during the relevant period, but also those defendants' *net profits* as opposed to *gross proceeds*, as well as overall percentage changes in defendants' holdings." *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 335 (S.D.N.Y. 2011).

Plaintiffs cite three trades during the alleged Class Period, consisting of sales by Mr. Stiller on February 15 and 24, 2012, totaling 1 million shares, and a trade by Mr. Blanford on February 28, 2012, of 54,002 shares. AC ¶¶ 101–102. These trades fail to raise any inference of

scienter as to either Mr. Stiller or Mr. Blanford, who address Plaintiffs' trading allegations in greater detail in their briefs in support of their motions to dismiss.[8]  As they explain, the stock sales represented a limited proportion of their overall holdings, amounting to a mere 4.07% for Mr. Blanford and 6.58% for Mr. Stiller.  Sales of such small percentages of a defendant's overall holdings do not raise any scienter inference, much less a strong and compelling one.  *See*, *e.g.*, *Rothman*, 220 F.3d at 94–95 (finding sales of under 10% of executive's company stock during the class period insufficient to establish the sales as "unusual").  Moreover, and as the Amended Complaint fails to even acknowledge, Mr. Stiller had asserted his intention to sell portions of his Company stock in a Form 144 filing well before the start of the Class Period, and Mr. Blanford's trade was executed pursuant to a predetermined Rule 10b5-1 trading plan executed in November 2011.[9]  Vito Decl. Ex. 12 (Aug. 4, 2011 Stiller Form 144); Vito Decl. Ex. 13 (Feb. 28, 2012 Blanford Form 4).  These circumstances counter any inference of scienter, particularly as to Mr. Blanford's trade, as the Second Circuit has held that sales pursuant to a Rule 10b5-1 trading plan do not raise any scienter inference.  *See Fishbaum v. Liz Claiborne, Inc.*, No. 98-9396, 1999 WL 568023, at *4 (2d Cir. July 27, 1999) (sales made under "a periodic divestment plan" do not raise an inference of improper trading); *Glaser*, 772 F. Supp. 2d at 592 ("[I]t is well established that trades under a 10-b-5-1 plan do not raise a strong inference of scienter") (internal quotation marks omitted); *Gildan*, 636 F. Supp. 2d at 272 (fact that sales were made pursuant to a Rule

---

[8] *See* Blanford and Rathke Memorandum in Support of Motion to Dismiss the Amended Complaint at III(C); Stiller Memorandum in Support of Motion to Dismiss the Amended Complaint ("Stiller Memorandum") at III(B).

[9] SEC regulations authorize the creation of so-called Rule 10b5-1 trading plans, which are written agreements whereby an executive in a public company commits to a pre-determined schedule for sales or purchases of the company's stock. The plan removes from the insider any discretion "to exercise any subsequent influence over how, when, or whether to effect purchases or sales." 17 C.F.R. § 240.10b5-1(c)(1)(i)(B)(3).

10b5-1 trading plan "undermines any allegation that the timing or amounts of the trades was unusual or suspicious."); *IAC/InterActiveCorp*, 478 F. Supp. 2d at 604 (trades under 10b5-1 plan "do not raise a strong inference of scienter").

More importantly, when considered holistically, Plaintiffs' trading allegations fail to raise any inference that the Individual Defendants, or anyone else at the Company, had actual knowledge that the second quarter and fiscal 2012 projections disclosed in Green Mountain's February 1, 2012 earnings release were false when made. *First*, the overwhelming majority of the alleged sales are associated with Green Mountain's founder and Chairman of the Board, Mr. Stiller, a non-executive whom Plaintiffs fail to allege had any involvement in the claimed fraud. *See, e.g.,* AC ¶¶ 24–25, 45; *IAC/InterActiveCorp*, 478 F. Supp. 2d at 605 (refusing to impute knowledge of material nonpublic information to Board member merely because he held position on Board); *see also Russo v. Bruce*, 777 F. Supp. 2d 505, 517–18 (S.D.N.Y. 2011) (noting that it was "problematic for plaintiffs' theory" that the individual defendant who allegedly engaged in insider trading was not alleged to have "participated in the fraud"); *Warchol*, 2012 WL 256099, at *8 (same, citing *Russo*). Moreover, the motive Plaintiffs ascribe to Mr. Stiller is entirely divorced from the forecasting allegations upon which they premise their claims. Notably, Plaintiffs do not allege that Mr. Stiller sold shares in February supposedly with knowledge that the Company's financial forecasting model was ineffective. Instead, Plaintiffs repeatedly claim that Mr. Stiller allegedly sold the shares with advance knowledge of the fact that one of Green Mountain's competitors, Starbucks, intended to introduce a single-cup espresso brewer system. AC ¶¶ 63–67 (section entitled "Defendant Stiller's Sale of Stock Before Known Starbucks Threat Was Publicly Disclosed"), 103, 104. These allegations are entirely unconnected to the allegedly false financial projections in the February 1, 2012 earnings release Plaintiffs challenge,

and therefore do nothing to raise a strong and compelling inference of scienter.[10]  *See In re*

*Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 251 (S.D.N.Y. 2007) (plaintiffs must allege a

"basis from which to infer that [] stock sales were related to any knowledge of wrongdoing").

    *Second*, the absence of any trades by other directors or officers, along with the fact that

both Mr. Blanford's and Ms. Rathke's total holdings increased during the Class Period, is wholly

inconsistent with any possible theory of motive.  Ms. Rathke, an Individual Defendant alleged to

have made one of the purported misstatements, did not sell during the Class Period and actually

*her holdings increased during the period*.[11]  *See In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F.

Supp. 2d 323, 345 n. 25 (W.D.N.Y. 2008) (an insider's increase in company holdings "negate[s]

any inference of scienter sought to be drawn from stock sales during the Class period");

*Warchol*, 2012 WL 256099, at *8 ("[I]t is difficult to read [the complaint] as consistent with

[Individual Defendant's] investment.").  Mr. Blanford is the only executive alleged to have

traded in the Class Period, and his total holdings, just like those of Ms. Rathke, actually

---

[10] Plaintiffs also point to the fact that Mr. Stiller's brokerage firm effected a forced sale of 5 million shares of his Company stock on May 7, 2012. AC ¶ 69.  The forced sale was related to margin loans that were secured by pledges of Mr. Stiller's stock.  The shares were sold in response to a margin call when the Company's stock price precipitously declined following the May 2, 2012 earnings announcement.  *See* Vito Decl. Ex. 14 (Company Press Release dated May 8, 2012).  Mr. Stiller's margin sale does nothing to advance Plaintiffs' scienter allegations.  In addition to occurring after the alleged Class Period, courts have recognized that such involuntary sales do not support a scienter inference.  *See Coates v. Heartland Wireless Commc'ns, Inc.*, 26 F. Supp. 2d 910, 919-20 (N.D. Tex. 1998) ("Plaintiffs do not plead facts that support the inference that Webb's sale to satisfy a margin call was unusual. The sale was involuntary, in which Webb was probably forced to recognize a loss. And the notion that Webb would engage in fraud and then wait for the stock price to plummet before selling his securities without benefiting from the fraud is a 'non-sensical premise.'").

[11] Ms. Rathke was awarded 2,494 shares of restricted stock and 16,630 stock options on March 22, 2012.  *See* Vito Decl. Ex. 15 (Mar. 22, 2012 Rathke Form 4).

*increased.*[12]  Finally, no other director or officer sold shares during the Class Period, another fact that counters any inference of scienter.  *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Phillip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) ("[T]he fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); *see also Acito*, 47 F.3d at 54 (scienter not pled based on sales by only one of four individual defendants).

### B.   The Amended Complaint's Confidential Witness Statements Regarding Inventory and Demand Planning Fail to Support an Inference of Scienter as to Missed Financial Forecasts

As set forth above, because Plaintiffs do not allege any motive, "their circumstantial evidence of actual knowledge must be correspondingly greater."  *Slayton*, 604 F.3d at 776. Plaintiffs' confidential witness ("CW") allegations fall far short of meeting Plaintiffs' burden of pleading knowing falsity as to the challenged statements.  *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 502–3 (S.D.N.Y. 2004) ("[I]f the plaintiffs alleged that the defendants issued overly optimistic sales forecasts, it would be impossible to show that the forecasts were false when made unless plaintiffs could plead facts indicating that the speakers had access to information that contradicted those forecasts.").  Here, Plaintiffs must plead that the Individual Defendants had actual knowledge that one of the "three implicit factual assertions" in a forward-looking statement was untrue at the time the statement was made: "(i) that the statement is genuinely believed; (ii) that there is a reasonable basis for that belief; and (iii) that the speaker is not aware of any undisclosed facts tending to seriously undermine the

---

[12] Mr. Blanford was awarded 55,432 shares of restricted stock on March 22, 2012 pursuant to his February 1, 2012 Employment Agreement and sold 54,002 shares during the Class Period.  *See* Vito Decl. Ex. 16 (Feb. 1, 2012 Form 8-K); Vito Decl. Ex. 17 (Mar. 22, 2012 Blanford Form 4); Vito Decl. Ex. 13.

accuracy of the statement."[13]  *Slayton*, 604 F.3d at 774.  Plaintiffs' tenuous confidential witness accounts do not meet the standards required in this Circuit to even consider the witnesses' assertions, let alone to establish a cogent and compelling inference that the Individual Defendants were confronted with information that undermined the financial projections the Company shared with the market in its February 1, 2012 earnings release.

At the outset, none of the confidential witnesses is even alleged to have been employed at the Company during the Class Period or when the misstatements were allegedly made.  CW2 and CW3 left the Company during 2010, at least a year and a half prior to the beginning of the Class Period, and CW1 likewise departed in September 2011, five months prior.  AC ¶ 11.  The Amended Complaint makes no attempt to explain why their information could be relevant to events that occurred long after their employment ended, which precludes any consideration of their statements.  *See Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335–36 (S.D.N.Y. 2009) (dismissing complaint and rejecting scienter allegations based, in part, on two confidential witnesses who departed the company prior to the class period).

Moreover, as this Court already is familiar, the Second Circuit's decision in *Novak v. Kasaks* requires that Plaintiffs' confidential witness allegations set forth "with *sufficient particularity* . . . the *probability* that a person in the position occupied by the source would possess the information alleged."  *Warchol*, 2012 WL 256099, at *11 (emphasis added) (citing *Novak*, 216 F.3d at 314).  Plaintiffs' confidential witnesses—a "Production Maintenance Manager," a "Director of Operations," and a "Distribution Resource Planning Manager"—are described as operations employees within a single business unit who dealt with "demand

---

[13] As Mr. Stiller argues in his motion to dismiss, the Amended Complaint does not sufficiently allege that he even made either of the statements Plaintiffs challenge as false.  Stiller Memorandum at II.

planning," or coordinating the purchase of new goods, the manufacturing of finished product, and the movement of product to meet possible customer orders.[14]   AC ¶ 11.   None of the confidential witnesses is alleged to have occupied any position that would have made it even possible, let alone *probable*, for that witness to have insight into the Company's enterprise-level financial projections as announced in publicly reported quarterly releases.   *See, e.g., McKenna*, 2012 WL 1131935 at *11 (dismissing complaint because it lacked allegations as to how confidential witnesses would have "particular knowledge as to declining demand . . . or where or when particular defendants came to have that information."); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 955 (D. Ariz. 2007) (dismissing complaint where plaintiffs "fail[ed] to allege facts showing . . . that the CWs were involved in [the company's] forecasting process or that the CWs were in a position to possess knowledge about the forecasting process").

Likewise, the Amended Complaint fails to supply the critical link required to plead scienter where plaintiffs challenge a forward-looking statement.   The confidential witnesses do not specify any information that was known to any Individual Defendant that evidenced flaws in the Company's financial forecasting model or any decline in demand when Green Mountain provided future sales and earnings guidance in February 2012.[15]   *See Teamsters Local 445*

---

[14] Green Mountain's Knoxville, Tennessee facility is part of its Specialty Coffee Business Unit. Vito Decl. Ex. 1 at 18.  CW1 and CW2 are alleged to have worked at that facility.  AC ¶ 11. CW3 is alleged to have reported to Don Holly, who is alleged to be in charge of production decisions at that facility.  AC ¶¶ 20, 26–27.

[15] Plaintiffs' confidential witness allegations stray into other areas, including suggestions that Green Mountain did not accurately account for its inventory and expired product and, as to CW3, that he or she supposedly left the Company in April 2010 after being "asked to break the rules regarding quarterly revenue recognition."  AC ¶ 29.   As noted above, *see supra* n.6, the Amended Complaint does not allege that the conduct supposedly observed by any of the confidential witnesses rendered the Company's Class Period financial statements false or misleading in any respect.  Further, these confidential witness accounts fail to raise any inference of scienter for the same reasons already discussed.  In particular, as with the financial forecasting allegations, none of the confidential witnesses "provide specific instances in which Defendants

*Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 196–97 ("[W]here Plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").  Rather, the confidential witness claims are limited to assertions that: (1) Defendants Rathke and Blanford "would occasionally sit in on" weekly meetings to discuss "requirements and status of a newly proposed global demand planning system"; (2) the Individual Defendants attended "two Company-sponsored 'getaways' to provide training on the new demand systems being reviewed and considered for purchase"; and (3) Defendant Blanford was "joined at the hip" with Don Holly, who controlled production decisions, including demand planning, and was involved in the disposal of expired inventory. AC ¶¶ 82–83, 85, 88–93, 95.  Nowhere do these allegations specify contrary information known to the Individual Defendants.  At most, the confidential witnesses simply contend the Individual Defendants may have had "access" to unspecified information about challenges with demand planning.  AC ¶¶ 30, 97, 122, 129.  In particular, the Amended Complaint lacks any factual allegations regarding the processes used by the Company to develop the enterprise-wide net sales and non-GAAP EPS forecasts Plaintiffs allege to be false.  As already noted, this is in no small part due to the fact that Plaintiffs rely entirely on allegations from lower level operations employees who are not alleged to have any insight into either enterprise-wide financial forecasts or the operation of any forecasting model, or how the results of that model were translated into the Company's enterprise-wide financial projections in its public disclosures.

Such threadbare allegations do not pass muster under the PSLRA or *Tellabs*.  *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460

---

received information that was contrary to their public declarations."  *Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010).

(S.D.N.Y. 2010) (discrediting "low-level employee[]" confidential witness allegations when the witnesses "had no access to aggregated data" and "no contact with the Individual Defendants"); *Glickman v. Alexander & Alexander Servs., Inc.*, No. 93 Civ. 7594, 1996 WL 88570, at \*14 (S.D.N.Y. Feb. 29, 1996) (holding CEO's "unfettered access" to company records "is an inadequate basis for scienter" and "would expose virtually any CEO, by virtue of his or her position alone, to liability").   In particular, Plaintiffs' bald allegation that purported demand declines and financial forecasting weaknesses were known to Defendants, *see* AC ¶ 98, falls far short of alleging specific facts (as is required) indicating how, what, why, and when each Defendant allegedly knew.[16]  *See, e.g., McKenna*, 2012 WL 1131935, at \*12–\*13.

### C. The Opposing Inference of Innocent Conduct Is Far More Cogent and Compelling

The Supreme Court's opinion in *Tellabs* makes clear that an inference of scienter is considered "*strong*" only if it is "more than merely 'reasonable' or 'permissible.'"  *Tellabs*, 551 U.S. at 324 (emphasis added).  "[I]t must be cogent and compelling" and "at least as compelling as any opposing inference one could draw from the facts alleged."   *Id.*   Here, the innocent inference is obvious and far more compelling.  Green Mountain's sales miss in the second quarter of fiscal 2012 and the Company's subsequent reduction of its annual financial forecasts

---

[16] Aside from confidential witness accounts, Plaintiffs do not provide any circumstantial allegations that would raise any scienter inference, let alone one strong or compelling enough to satisfy *Tellabs*.  The pendency of an SEC inquiry into Green Mountain's accounting practices, *see* AC ¶ 36, "cannot support any inferences of wrongdoing or fraudulent scienter on the part of [a] company or its senior management," particularly where the alleged subject matter bears no relation to the forecasting Plaintiffs challenge here.  *Police & Fire Ret. Sys. v. Safenet, Inc.*, 645 F. Supp. 2d 210, 230 (S.D.N.Y. 2009) (internal quotation marks omitted); *Warchol*, 2012 WL 256099, at \*14; *see also Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, No. 11 Civ. 398, 2012 WL 4616958, at \*9 (S.D.N.Y. Sept. 28, 2012).   Moreover, the "gratuitous commentary of outsiders" such as Sam Antar, a convicted felon, cannot substitute for particularized scienter allegations.  AC ¶ 74; *Hershfang v. Citicorp*, 767 F. Supp. 1251, 1255 (S.D.N.Y. 1991); *see also Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 215 (2d Cir. 2010) ("It is not enough to quote press speculation about defendants' motives . . . .  Such allegations simply do not provide . . . specific, well-pleaded facts.") (citations omitted).

were the natural byproduct of the uncertainties and difficulties associated with projecting sales growth—particularly where the number of brewers Green Mountain had sold had accelerated dramatically and more data and experience were needed to assess how customer appetite for K-Cup® portion packs would evolve.

Green Mountain experienced staggering growth in the three years leading up to the Class Period.  During that time, Green Mountain relied on a financial forecasting model that had proved to be reliable in allowing the Company to provide net sales and non-GAAP EPS forecasts to the marketplace.  *See* Vito Decl. Ex. 7 at 7 ("[W]e do have confidence in our model as we back-check it in '10, '11.").  But as the Company increased penetration in its various retail channels, its financial forecasting model needed to be adjusted to reflect sell-through to consumers as opposed to sales generated from increased retailer adoption that necessarily reflected retailer stock requirements.  *See supra* at 9–10.  At the start of the Class Period, Green Mountain informed investors that assumptions in its financial forecasting model with regard to customer purchasing patterns for K-Cup® portion packs would need to be re-evaluated.  *See supra* at 6–8.  At that time, the Company resisted pressure from analysts to raise financial forecasts and instead reaffirmed annual estimates it had developed based on lower expectations. *See supra* at 7–8.  When Green Mountain subsequently missed its forecasted sales expectations in the second quarter, the Company once again acknowledged that it was in the process of refining its model, a process that required customer polling and time to observe any changes in consumer consumption habits.  *See supra* at 9.  By the end of the third quarter of fiscal 2012, Green Mountain was able to provide greater insight into why its financial forecasting model had faltered during the second quarter.  *See supra* at 9–10.  That the Company investigated what appeared to be inconsistencies in its financial forecasting model and promptly disclosed its

findings is "a prudent course of action that weakens rather than strengthens an inference of scienter." *Slayton*, 604 F.3d at 777.

Accordingly, the Amended Complaint must be dismissed for failure to plead the strong and compelling inference of scienter *Tellabs* demands.

## CONCLUSION

For all of the reasons set forth above, Plaintiffs' Amended Complaint should be dismissed with prejudice.

Dated at Burlington, Vermont this 17th day of January, 2013.

**COUNSEL FOR DEFENDANT GREEN
MOUNTAIN COFFEE ROASTERS, INC.**

By:     /s/ Matthew S. Borick
        Robert B. Luce
        Matthew S. Borick
        DOWNS RACHLIN MARTIN PLLC
        Courthouse Plaza
        199 Main Street, P.O. Box 190
        Burlington, VT 05402-0190
        Telephone: 802-863-2375
        Facsimile: 802-862-7512
        bluce@drm.com
        mborick@drm.com

        Randall W. Bodner *(admitted pro hac vice)*
        R. Daniel O'Connor *(pro hac vice application pending)*
        Anne Johnson Palmer *(admitted pro hac vice)*
        Michael Vito *(admitted pro hac vice)*
        ROPES & GRAY LLP
        Prudential Tower
        800 Boylston Street
        Boston, MA 02199-3600
        Telephone: 617-951-7000
        Facsimile: 617-951-7050
        randall.bodner@ropesgray.com
        daniel.oconnor@ropesgray.com
        anne.johnsonpalmer@ropesgray.com
        michael.vito@ropesgray.com