UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

```
KAMBIZ GOLESORKHI and WILLIAM C. :
DAILEY, individually and on       :
behalf of all others similarly    :
situated,                         :
                                  :
          Plaintiffs,             :     Case No. 2:12-cv-91
                                  :
     v.                           :
                                  :
GREEN MOUNTAIN COFFEE             :
ROASTERS, INC., et al.,           :
                                  :
          Defendants.             :
```

**Opinion and Order:**
**Defendants' Motions to Dismiss the Amended Complaint**

Plaintiffs Kambiz Golesorkhi and William Dailey bring this putative class action suit on behalf of all those who purchased common stock of Green Mountain Coffee Roasters, Inc. ("GMCR" or the "Company") between February 2, 2012 and May 2, 2012 (the "Class Period").  The Plaintiffs claim that GMCR and three of its officers, Robert Stiller, Lawrence Blanford, and Frances Rathke[1] (the "Individual Defendants"), made materially false and misleading statements and omissions in violation of Section 10(b) of the Exchange Act[2] and 17 C.F.R. § 240.10b-5.[3]  The Plaintiffs further claim that the Individual Defendants were

---

[1] During the Class Period, Stiller served as the Chairman of the Board of Directors of the Company, Blanford was the President, Chief Executive Officer, and Director, and Frances Rathke was the Chief Financial Officer, Treasurer, and Secretary.  Am. Compl. ¶¶ 46-48.

[2] Pub. L. 73-291, 48 Stat. 881, codified at 15 U.S.C. § 78a. *et seq.*

[3] For ease of reference, the Court refers to both the statute and the regulation as "10b-5."

"controlling persons" and are therefore also liable under Section 20(a) of the Exchange Act.  GMCR, Blanford and Rathke, and Stiller have all filed motions to dismiss.  *See* Mots. To Dismiss, ECF Nos. 29, 30, 32.

For the reasons stated below, both claims in the Amended Complaint, ECF No. 22, are dismissed.

## BACKGROUND

## I.   Alleged Misstatements or Omissions of Material Fact

Plaintiffs' claims are premised on two sets of statements by the Defendants.  The statements accompanied GMCR's release of its first quarter results for fiscal year 2012 on February 1, 2012.  *See* GMCR Reports Fiscal Year 2012 First Quarter Results ("Press Release"), ECF No. 32-5.  The Company announced that its total net sales had surpassed expectations and increased 102 percent over the same quarter for 2011.  One section of GMCR's Press Release, entitled "Business Outlook and Other Forward-Looking Information," contained the following statement:

> "Our brewer sales in the first quarter of fiscal year 2012 were above our expectations, with approximately 4.2 brewers sold by the combination of GMCR and our licensed partners. That total is more than half of the 6.5 million brewers sold in all of our fiscal year 2011," said Blanford.  "As these brewers come into use, we expect them to have a positive impact on future portion pack demand.  Given the challenge of estimating sales in such a dynamic environment, in the coming months we will be working to ensure we apply appropriate rigor and analyses to confirm and refine our modeling assumptions and estimates of forward demand.  In the meantime however, we are

2

> reaffirming our prior revenue and earnings estimates for
> fiscal year 2012."

*Id.* at *4.  The "prior revenue and earnings estimates" to which
Blanford referred included a total consolidated net sales growth
of 60 to 65 percent in 2012, non-GAAP[4] earnings per diluted share
in the range of $2.55 to $2.65, and capital expenditures between
$630 million and $700 million for fiscal year 2012.  *Id.*

The Press Release also contained a litany of disclaimers
and warnings.  First, it explained that the Company was
providing non-GAAP results in the interest of transparency even
though the numbers provided did not take into account certain
expenses and liabilities, including currency risks, legal and
accounting expenses, and non-cash related items.  *Id.*  Second,
the release contained a lengthy paragraph warning readers that
certain representations in the document were "Forward-Looking
Statements" that reflected management's best analyses at that
point in time and therefore might not prove to be accurate
predictions of the Company's actual results.  GMCR further
stated that among other factors, "the difficulty in forecasting
sales and production levels," "the impact of the loss of major
customers for the Company or reduction in the volume of
purchases by major customers," "the Company's level of success
in continuing to attract new customers," "sales mix variances,"

---

[4] The acronym GAAP stands for Generally Accepted Accounting Principles.

and "delays in the timing of adding new locations with existing customers," could all affect whether the Company would meet its performance expectations.  *Id.* at 5.[5]

In its Press Release, GMCR also directed investors to the set of risks it had described more thoroughly in the Company's Annual Report on Form 10-K for fiscal year 2011 and other filings with the SEC.  *See* Compilation of Cautionary Statements, ECF No. 32-13 at *2-8.  That document describes many of the aforementioned factors in greater detail, including several passages that specifically address the difficulties of predicting demand and the effect that changes in demand would have on the Company's financial performance.  For example, GMCR stated that its results were extremely dependent on the sales of Keurig® single-cup brewing systems and K-Cup® portion packs; "any substantial or sustained decline in the acceptance of [those products]," GMCR explained, "would materially adversely affect us."  *Id.* at *2.  In addition, GMCR stated that demand for its products could be dampened by competition from other brands; changes in consumer tastes and preferences; changes in consumer lifestyles; national, regional, and local economic conditions; perceptions or concerns about the environmental impact of its products; demographic trends; and perceived or

---

[5] GMCR included the same warnings in the prepared remarks that accompanied the Press Release.  *See* Prepared Remarks for First Quarter Fiscal Year 2012 Results, ECF No. 32-21 at *6.

actual health benefits. *Id.* at 2, 4. GMCR also noted that the nature of its products—mainly hot beverages—exposed the Company to seasonal variations in demand. *Id.* at 6.

The second set of statements Plaintiffs identify are from a presentation that Defendants Blanford and Rathke gave to the 2012 Consumer Analyst Group of New York Conference on February 21, 2012. Blanford and Rathke opened the presentation with a series of warnings. Blanford cautioned the audience that he and Rathke would "be making certain statements today that are forward looking[.] [A]ctual results, due to uncertainties could be different in a material way, and similarly, we'll be using both GAAP as well as non-GAAP results . . . ." Transcript of GMCR Presentation to the Consumer Analyst Group of New York Conference ("Presentation Tr.") at *3, ECF No. 32-6. The PowerPoint accompanying the oral warning included a slide entitled "Forward-Looking Statements" and contained the same disclaimer as the Press Release, including the reference to the risks more fully described on the Company's Annual Report on Form 10-K for fiscal year 2011. *See* GMCR PowerPoint Presentation to 2012 Consumer Analyst Group of New York Conference ("PowerPoint"), ECF No. 30-3 at *3. During the presentation, Rathke repeated the Company's estimate that its non-GAAP earnings per share for 2012 would be within the range of $2.55 to $2.65. *See* Presentation Tr. at *25-27. Rathke also

stated that the Company estimated that its earnings in 2012 would "grow at the rate of sales growth or slightly below." *Id.* at *26.

On May 2, 2012, GMCR announced its financial performance for the second quarter and in so doing revised its full-year estimates for sales, earnings, and capital expenditures. Am. Compl. ¶ 57. GMCR's sales growth was 37 percent for the quarter, which was short of the 40 to 50 percent growth that the Company had previously estimated. Accordingly, the Company lowered its annual expectations for non-GAAP earnings to $2.50 per share from $2.65. *Id.* Defendant Blanford attributed the downward revision to "lower-than-anticipated portion pack sales, and to a lesser degree, brewer sales." *Id.* The Company also reported that inventories had grown to $602.1 million, an increase of more than 100 percent over the previous year's inventory level of $300.8 million. *Id.*

## II. Allegations of Scienter

The Plaintiffs advance two theories of scienter: First, the Plaintiffs allege that the Defendants were aware that the Company's models for predicting consumer demand as well as the Company's inventory accounting were flawed. *Id.* ¶ 4. For that reason, Plaintiffs contend that the Defendants were either reckless with respect to the veracity of the statements in the Press Release and PowerPoint or had actual knowledge that they

were false.   Second, the Plaintiffs allege that Defendants

Stiller and Blanford had a motive and opportunity to

misrepresent the financial condition of the company because

during the Class Period, they sold stock that was worth nearly

$70 million.

> **A.   Defendants' Knowledge of Slowing Demand and Flawed
>        Demand Modeling**

Plaintiffs' allegations about GMCR's demand forecasting are

based on information from three confidential witnesses ("CWs"):

CW1 was employed as GMCR's Production and Maintenance Manager in

Knoxville, Tennessee from 2009 to September 2011 and reported to

CW2 and to David Tilgner, GMCR's Senior Director for Planning

and Logistics.   CW2 worked as GMCR's Director of Operations,

also in Knoxville, from October 2008 until September 2010.   CW2

reported to Jon Wettstein, GMCR's Vice President of Supply Chain

Operations, who in turn reported to Blanford.   *Id.* ¶ 17.   CW3

was the Distribution Resource Planning Manager at GMCR from

August 2009 to April 2010 and reported directly to Don Holly,

GMCR's Director of Roasting & Quality, and indirectly to

Wettstein.   *Id*. ¶¶ 11, 20.   CW3 also recalls attending weekly

meetings with Wettstein and Scott McCreary, the President of the

Specialty Coffee Business Unit about the new demand system.   Am.

Compl. ¶ 21.   Throughout the Amended Complaint, Plaintiffs

repeat the refrain that Holly was "joined at the hip with

Defendant Blanford and Wettstein, . . . ." *Id.* ¶ 20.  None of
the confidential witnesses worked at GMCR during the Class
Period.

All three CWs confirm that demand forecasting was generally
known to be flawed at the Company.  CW2 reports that GMCR was
using antiquated software for its demand planning system.  *Id.*
¶¶ 12, 17.  CW2 and CW3 state that GMCR managed its demand
planning in Excel in a way that made it impossible to pull data
for particular territories or to look at past performance.  *Id.*
¶¶ 18-19, 22.  CW3 claims that she was hired to implement a new
global demand system, *id.* ¶ 12, and was told by Don Holly that
GMCR's method of demand planning and forecasting with Excel
spreadsheets "was not working."  *Id.* ¶ 18.  CW3 further states
that Blanford and Rathke were occasionally in attendance at
weekly meetings and that everyone who was there was aware that
the existing demand planning system was inaccurate.  Am. Compl.
¶¶ 13, 22.  CW3 also participated in two Company-sponsored "get
aways" in which the new demand system was reviewed and
considered; according to CW3, Defendants Stiller, Blanford, and
Rathke attended both of these events.  *Id.* ¶ 24.

CW3 indicates that little improvement had been made to
GMCR's demand forecasting by the time she left the Company in
2010.  *Id.* ¶ 25.  CW3 states that she quit in April 2010 after
Holly and Wettstein asked her to "show more sales than were

actually made and show less inventory than was on hand" and thereby break the rules for quarterly revenue recognition. *Id.* ¶ 29. According to CW3, the altered numbers would have justified higher production levels for GMCR, which in turn resulted in higher bonuses for Holly and Wettstein. *Id.* CW3 reports that after her departure, she was in contact with David Hull, GMCR's Demand Planning and Budget Manager, who told her in October 2012 that GMCR had yet to fully implement the new demand planning system and that neither the old nor the new system was accurate. *Id.* ¶ 25.

Plaintiffs also allege that GMCR delayed writing off inventory until after the end of a quarter and pushed out inventory to its distributors to "make the sales numbers look good." *Id.* ¶ 30. CW1 recalls asking management why expired coffee was not immediately written off and was told that the Company could maintain shareholder confidence by delaying inventory write-offs until after the quarter's end. Am. Compl. ¶ 30. CW1 further stated that expired coffee was considered an asset until it was officially recognized as being expired, at which point it could then be written off. *Id.* ¶ 34. According to CW1, this meant that "expired coffee was always included in the inventory numbers provided to the public, and that as a result there was never an accurate statement of inventory." *Id.*

Relying on CW1, Plaintiffs also contend that GMCR was producing as much coffee as possible regardless of demand, *id.* ¶ 26, and was not writing off expired coffee as it expired, Am. Compl. ¶¶ 32-33.  Both CW1 and CW2 identified Holly as the one who was ultimately responsible for setting production numbers, though production decisions were made on a weekly conference call with other GMCR managers.  *Id.*  ¶¶ 27-28

**B.  Stock Sales**

In sum, Stiller and Blanford sold more than one million shares of GMCR stock for over $69 million during the Class Period.  On February 15, 2012, two weeks after GMCR issued its First Quarter Press Release, Defendant Stiller sold 500,000 shares of his personally-held stock for $32,919,052.04.  *Id*. ¶¶ 6, 61.  Stiller then sold an additional 500,000 shares on February 24, 2012 for $33,291,695.33.  *Id.*  On February 28, 2012, Defendant Blanford sold 54,002 shares of his personal-held GMCR stock for proceeds of $3,587,352.00.  *Id.* ¶ 7.

Plaintiffs allege that Stiller's stock sales were suspiciously timed because they occurred shortly before Starbucks announced, on March 8, 2012, that it would be introducing its own single-cup brewer to compete with GMCR's Keurig coffee maker.  *Id.* ¶ 63.  A March 26, 2012 article in *Bloomberg* reported that Starbucks had informed GMCR of its plans prior to its public announcement of the competing brewer;

however, it is unclear precisely when Starbucks contacted GMCR to disclose this information.  Am. Compl. ¶ 8.  On March 9, 2012, GMCR filed a Form 8-K that stated that GMCR had "recently learned of Starbucks'[s] planned initiative in the espresso-based single-cup category."  *Id.* ¶ 10.

On May 7, 2012, Stiller sold five million shares of GMCR stock from his brokerage account at a time when GMCR's internal trading window was closed.  *Id.* ¶ 68.  The next day, on May 8, 2012, Defendant Stiller was removed from his position as Chairman of GMCR's board as a result of that sale, which GMCR stated was "inconsistent with the Company's internal trading policies."  *Id.*

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To determine whether a complaint articulates plausible claims for relief, the Court must engage in a "context-specific" inquiry and "draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.  Generally, "[a] claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct

11

alleged." *Id.* at 663 (citing *Twombly*, 550 U.S. at 556).  On a motion to dismiss, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

In addition, under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), private plaintiffs alleging violations of securities laws or regulations must conform to heightened pleading standards.  Thus, to state a 10b-5 claim, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns*, 493 F.3d at 105. A 10b-5 claim must also comply with Federal Rule of Civil Procedure 9(b), which requires a party to "state with particularity the circumstances constituting fraud or mistake." *See also ATSI,* 493 F.3d at 105.  Under Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the

12

statements were fraudulent." *Rombach v. Chang,* 355 F.3d 164,
170 (2d Cir. 2004).

Not all statements made by public companies and their
officials are actionable.  The PSLRA established a safe harbor
provision that precludes defendants from being liable for any
forward-looking statement if

> (A) the forward-looking statement is--
>
>> (i) identified as a forward-looking statement, and is
>> accompanied by meaningful cautionary statements
>> identifying important factors that could cause actual
>> results to differ materially from those in the
>> forward-looking statement; or
>>
>> (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking
> statement--
>
>> (i) if made by a natural person, was made with actual
>> knowledge by that person that the statement was false
>> or misleading; or
>>
>> (ii) if made by a business entity; was--
>>
>>> (I) made by or with the approval of an executive
>>> officer of that entity; and
>>>
>>> (II) made or approved by such officer with actual
>>> knowledge by that officer that the statement was
>>> false or misleading.

15 U.S.C. § 78u-5(c)(1).[6]  Because the safe harbor rule is
written in the disjunctive, it applies if any of these three

---

[6] According to the SEC,

> The term executive officer, when used with reference to a
> registrant, means its president, any vice president of the
> registrant in charge of a principal business unit, division or
> function (such as sales, administration or finance), any other

conditions are met.  *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) ("[A] defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false and misleading.") (emphasis in original).

Defendants of 10b-5 claims may also find protection in the bespeaks-caution doctrine, which is "a corollary of the well-established principle that a statement or omission must be considered in context."  *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) (internal quotations omitted).  Under the doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading.  In such circumstances, it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency."  *Id.* (internal citations omitted).  As the Second Circuit has explained,

> The doctrine is one of a set of rules coping with the problem that forward-looking information poses for securities disclosure laws.  For decades, the disclosure of

officer who performs a policy making function or any other person who performs similar policy making functions for the registrant. Executive officers of subsidiaries may be deemed executive officers of the registrant if they perform such policy making functions for the registrant.

17 C.F.R. 240.3b-7; *see also* 15 U.S.C. 78u-5(i)(5) (delegating authority to the SEC to define "executive officer").

forward-looking information was generally prohibited by the
Securities and Exchange Commission (SEC).  That policy
changed in the 1970s.  To encourage disclosure of forward-
looking information notwithstanding certain
vulnerabilities, including the tendency of predictions to
be embarrassed by the passage of time, regulators developed
safe harbors.  The SEC promulgated a regulatory safe harbor
in 1979, see SAFE HARBOR RULE FOR PROJECTIONS, Securities
Act Release No. 532, 1979 WL 181199 (June 25, 1979)
(codified as amended at 17 C.F.R. §§ 230.175, 240.3b-6);
and Congress followed suit in 1995, see Private Securities
Litigation Reform Act of 1995 § 102(a), Pub.L. No. 104-67,
109 Stat. 737, 749 (codified at 15 U.S.C. § 77z-2).
Bespeaks caution is the courts' contribution.

*Id.* at 141-42.

## I.   Plaintiffs Rely on Forward-Looking Statements

The preliminary question is whether the statements

Plaintiffs have identified in their complaint are, in fact,

forward looking.  The PSLRA defines the term "forward-looking

statement" to include:

> (A) a statement containing a projection of revenues, income
> (including income loss), earnings (including earnings loss)
> per share, capital expenditures, dividends, capital
> structure, or other financial items;
>
> * * *
>
> (C) a statement of future economic performance, including
> any such statement contained in a discussion and analysis
> of financial condition by the management or in the results
> of operations included pursuant to the rules and
> regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating
> to any statement described in subparagraph (A), (B), or
> (C);
>
> * * * *

15 U.S.C. § 78u-5(i)(1).

Here, all of the alleged misstatements Plaintiffs identify are forward looking. Blanford's comments in the Press Release fall within the section of the document entitled "Business Outlook and Other Forward-Looking Information" and are in substance an affirmation of the projections the Company issued at the start of the fiscal year. Similarly, in Blanford and Rathke's conference presentation on February 21, 2012, Rathke repeated the Company's estimate that its non-GAAP earnings per share for 2012 would fall between $2.55 and $2.65. These comments are statements "containing a projection of revenues, . . . [or] earnings (including earnings loss) per share" as well as the "assumptions underlying or relating to [such statements]," 15 U.S.C. § 78u-5(i)(1), and therefore fall squarely within the definition of forward-looking statements under the PSLRA. The notion that reference to past projections prevents a company's statements about its expectations for future performance from being "forward looking" has no support in logic or law; to the extent the Company's comments referenced its past projections and performance, they did so in service of articulating the Company's expectations for the remainder of fiscal year 2012. *See Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 533 (D.N.J. 2010) ("[W]hile Defendants' statements are based on underlying historical facts, the statements are nevertheless forward-looking."); *Gissin v.*

16

*Endres*, 739 F. Supp. 2d 488, 506 (S.D.N.Y. 2010) ("In other words, context is everything. . . . Defendants were not making guarantees about the present; they were stating their educated guess about what the preceding quarter's financial data would mean for the Company's future.").

## II. Defendants' Statements Were Identified as Forward Looking and Accompanied by Meaningful Cautionary Statements

Nonetheless, for the PSLRA safe harbor rule to apply to these forward-looking statements, they must have been identified as forward looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c). Defendants carry the burden of demonstrating that those requirements are met; however, they need not show that they warned investors of the particular factor that caused their projections not to be true. *Slayton*, 604 F.3d at 773. For an oral forward-looking statement to be non-actionable, it must be accompanied by a cautionary statement that (1) identifies the particular statement as forward looking; (2) states that actual results might differ materially from those projected; and (3) references a readily available written document or portion thereof that identifies factors that "could cause actual results to materially differ from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2); *see also*

17

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, No. 09-cv-01740, 2013 WL 1188050 at \*16 (D. Conn. Mar. 23, 2013).

Both sets of statements identified by Plaintiffs comply with these requirements.  The Press Release clearly identified certain statements as "forward looking" and explained that such statements could be false for a number of reasons, including, among other things, "the difficulty in forecasting sales and production levels."  Press Release, ECF No. 32-5 at \*4.  The Press Release also made reference to risks more thoroughly described in GMCR's Annual Report on Form 10-K for fiscal year 2011 as well as other filings with the SEC.  *See* Compilation of Cautionary Statements, ECF No. 32-13 at \*2-8.  And, contrary to the suggestion that his Press Release comments mislead investors about the precision of GMCR's demand planning, Blanford made specific reference to "the challenge of estimating sales in such a dynamic environment" and noted that the Company would "be working to ensure we apply appropriate rigor and analyses to confirm and refine our modeling assumptions and estimates of forward demand."  *Id*.

At the outset of their presentation on February 21, 2012, Blanford and Rathke gave similar warnings.  They explained that some of the statements in the presentation would be forward looking and that actual results could differ materially.  Presentation Tr. at \*3.  The first slide in the PowerPoint

18

included the same disclaimers contained in GMCR's Press Release, including a reference to the risks more thoroughly described in the Company's Annual Report on Form 10-K for fiscal year 2011. PowerPoint at *3.  Because the Defendants complied with the requirements for safe harbor under the PSLRA when they issued the Press Release and when Blanford and Rathke gave their presentation, their forward-looking statements are not actionable.

## III. Plaintiffs Have Not Adequately Pled Scienter

Plaintiffs' claims also fail for an independent reason: they do not adequately plead scienter.  To state a claim for relief under 10b-5, a complaint must "give rise to a strong inference of scienter."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).  Such an inference is strong "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324. Courts must therefore consider "plausible, nonculpable explanations for the defendant's conduct" in addition to inferences favoring the plaintiff.  *Id.*

### A.   Plaintiffs Have Not Alleged Sufficient Facts to Demonstrate that the Defendants Had Actual Knowledge That Their Statements Were False or Misleading

The safe harbor provision of the PSLRA requires dismissal if the Plaintiffs fail to allege particularized facts

19

establishing a strong inference that the Defendants (or, in the
case of GMCR, one of its executive officers) had "actual
knowledge" that the Company's statements were false or
misleading.  *See* 15 U.S.C. § 78u-5(c)(1)(B); *Slayton*, 604 F.3d
at 773.  "[B]ecause the safe harbor specifies an 'actual
knowledge' standard for forward-looking statements, 'the
scienter requirement for forward-looking statements is stricter
than for statements of current fact.'"  *Slayton*, 604 F.3d at 773
(quoting *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d
242, 274 (3d Cir. 2009)).  "Whereas liability for the latter
requires a showing of either knowing falsity or recklessness,
liability for the former attaches only upon proof of knowing
falsity."  *Id.* (quoting *Avaya*, 564 F.3d at 274).

　　　Plaintiffs' Amended Complaint does not include any
particularized allegations demonstrating that any of the
Individual Defendants or executive officers at GMCR had actual
knowledge that the statements in the Press Release or the
PowerPoint were materially false or misleading.  Plaintiffs'
confidential witness allegations support the inference that
Blanford, Rathke, Stiller, and Wettstein[7] were present at
meetings where GMCR's demand planning systems were discussed,
*see, e.g.,* Am. Compl. ¶ 22.; however, Plaintiffs rely on

---

[7] Jon Wettstein was GMCR's Vice President of Supply Chain Operations,
which qualifies him as an "executive officer" within the meaning of 17
C.F.R. 240.3b-7.

generalized assertions that those executives therefore must have
known that the demand planning system was accurate without
identifying specific reports that would have indicated that to
be the case.  *See Novak*, 216 F.3d at 309 ("Where plaintiffs
contend defendants had access to contrary facts, they must
specifically identify the reports or statements containing this
information.").  Moreover, the Plaintiffs acknowledge that CW2
and CW3, the two witnesses who participated in those meetings,
left GMCR in 2010; for that reason, the meetings to which CW2
and CW3 refer preceded the Press Release and PowerPoint by more
than a year and a half.  CW2 and CW3's generalized observations
of Blanford, Rathke, Stiller, and Wettstein in meetings that
occurred in 2010 or earlier provide little basis from which to
infer that they were aware of the falsity of statements that
were issued in 2012.  For example, Plaintiffs' allegation that
Wettstein asked CW3 to break the rules for quarterly revenue
recognition relates to GMCR's actual quarterly revenue for 2010,
not its estimates for revenue in 2012.[8]  To the contrary, the
fact that CW3 was hired to improve the Company's demand system
suggests that GMCR was taking steps to make its forecasting data
more accurate.  In fact, according to Plaintiffs' own

---

[8] To the extent that Plaintiffs claim that GMCR had actual knowledge of
the falsity of its statements based on Wettstein's knowledge, they do
not allege that he approved the forward-looking statements they
identify, as required by 15 U.S.C. § 78u-5(c)(1)(B).

allegations, Holly prepared regular reports describing the progress of the new global demand planning system.  Am. Compl. ¶ 23.  At the time GMCR issued the Class Period statements, the Company was not representing that demand planning was perfect; rather, it disclosed that there were challenges to estimating sales in such an environment and that the Company was continuing to refine its models for estimating demand.  Press Release at *4.

**B.   Plaintiffs Also Have Not Adequately Plead Scienter Even If the Safe Harbor Rule Does Not Apply**

Even when the safe harbor rule of the PSLRA does not apply, a plaintiff in a 10b-5 action must still meet relatively demanding pleading standards for scienter by showing either: (1) "both motive and opportunity to commit the fraud" or (2) "strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns,* 493 F.3d at 99.

**1.   Motive and Opportunity**

"Motive . . . [can] be shown by pointing to the 'concrete benefits that could be realized' from one or more of the allegedly misleading statements or nondisclosures; opportunity [can] shown by alleging 'the means' used and the 'likely prospect of achieving concrete benefits by the means alleged.'"  *S. Cherry St., LLC v. Hennessee Group, LLC,* 573 F.3d 98, 108 (2d Cir. 2009) (quoting *Shields v. Citytrust Bancorp, Inc.,* 35 F.3d

1124, 1130 (2d Cir. 1994)).  Plaintiffs may meet this burden by alleging that "corporate insiders . . . misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit."  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).  An inference of bad faith and scienter may also be premised on "unusual insider trading activity during the class period."  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).  However, merely alleging goals possessed by virtually all corporate insiders "such as the desire to maintain high credit rating for the corporation or otherwise sustain the appearance of corporate profitability" is insufficient to plead motive.  *S. Cherry St.,* 573 F.3d at 109.  "Whether trading was unusual or suspicious turns on factors including (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants' selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).

Here, Plaintiffs have failed to allege particularized facts suggesting that either Blanford or Stiller's Class Period stock sales were unusual.[9]  Other than the fact that Blanford's sale occurred a week after his and Rathke's PowerPoint presentation, Plaintiffs have not offered any facts suggesting that Blanford's sale of 54,002 shares of GMCR stock on February 28, 2012 was unusual.  Instead, SEC filings reveal that Blanford's trade was made pursuant to a 10b5-1 trading plan executed on November 28, 2011, *see* Blanford SEC Form 4 (March 1, 2012), ECF No. 30-5, and that Blanford's Class Period sale was similar in size to previous sales.  *See* Blanford SEC Form (Sept. 21, 2011), ECF No. 30-6 (sale of 45,000 shares); Blanford SEC Form (Aug. 17, 2011), ECF No. 30-6 (sale of 45,000 shares); Blanford SEC Form (May 9, 2012), ECF No. 30-6 (sale of 51,573 shares).  Furthermore, Blanford's sale represented only a fraction of his GMCR holdings.  *See* DEF 14 A (Feb 2, 2012) (indicating that Blanford owned 1,309,991 exercisable and unexercisable options as of September 24, 2011).[10]  That Blanford's sale occurred prior to Starbucks's announcement of a competing brewer hardly raises a strong evidence of scienter because Blanford entered the 10b5-1 trading plan to sell his stock long before the date of the

---

[9] Rathke did not sell stock during the Class Period.

[10] "'[T]he weight of authority' favors taking account of both options and stock in the denominator when calculating the relative magnitude of an insider's sales." *Warchol v. Green Mountain Coffee Roasters, Inc.*, No. 10-cv-227, 2012 WL 256099 at *7 n.11 (D. Vt. Jan. 27, 2012) (quoting *In re Gildan Activewear*, 636 F.Supp.2d at 271 n. 5.)).

actual sale.  Viewed in the context of his prior sales and trading plan, Blanford's sales were neither unusual nor suspicious.

Nor were Stiller's.  The Amended Complaint includes a number of allegations pertaining to Stiller that occurred after the end of the Class Period, including the fact that Stiller was reprimanded by GMCR and removed as chairman of the board for a stock sale that violated the Company's internal trading policy. But Plaintiffs have not explained how those allegations support a strong inference that Stiller had a motive with respect to the Class Period Statements.  Instead, the Court's ultimate focus must be on the question of whether Stiller's two stock sales in February 2012 were unusual or suspicious.  Though those sales were certainly large—Stiller sold 1,000,000 shares for over $66 million—they were neither unusual nor suspicious.  On August 4, 2011, several months before the Class Period statements, Stiller filed a Form 144 with the SEC in which he presented a plan to liquidate 2,000,000 shares of GMCR stock.  Form 144 (Aug. 4, 2011), ECF No.29-2.  Stiller immediately sold 500,000 shares on August 4, 2011, which meant that he still had a further 1,500,000 shares to sell before reaching the amount set out in the August 4 Form 144.  *See* Form 4 (Aug. 5, 2012), ECF No. 29-3. Stiller's sale of 500,000 shares on February 15, 2012 and sale of 500,000 more on February 24, 2012 were therefore in keeping

25

with Stiller's previously announced plan to liquidate part of
his stake in the Company.  Furthermore, even though Stiller's
stock sales were significant, they represented a relatively
small fraction of his total holdings in the Company.  In an SEC
filing dated February 3, 2012, Stiller disclosed that he owned
15,207,832 shares over which he had sole voting power.  Form 13G
(Feb. 3, 2012), ECF No. 29-4.  Stiller's sale of 1,000,000
shares therefore represented only 6.58 percent of his personal
holdings.  Viewed in context, Stiller's stock sales were neither
unusual nor suspicious.  Plaintiffs have therefore failed
demonstrate that either Blanford or Stiller had a motive to
issue fraudulent statements during the Class Period.

### 2.   Conscious Misbehavior or Recklessness

In a 10b-5 action where the safe harbor is inapplicable, a
plaintiff may also plead facts demonstrating a defendant's
conscious misbehavior or reckless disregard for the truth.  *S.
Cherry St.*, 573 F.3d at 109.  This requires showing "'conscious
recklessness—*i.e.*, a state of mind approximating actual intent,
and not merely a heightened form of negligence.'"  *Id.* (quoting
*Novak*, 216 F.3d at 312 (internal quotation marks omitted)
(emphasis in original)).  To meet this standard, Plaintiffs must
allege conduct that "'is highly unreasonable and which
represents an extreme departure from the standards of ordinary
care to the extent that the danger was either known to the

defendant or so obvious that the defendant must have been aware of it.'" *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).  In essence, this requires showing that the defendants "knew facts or had access to information suggesting their public statements were not accurate" or "failed to check information that they had a duty to monitor." *Novak*, 216 F.3d at 311.  If the complaint fails to plead a motive to commit fraud, a plaintiff must make a "'correspondingly greater'" showing of strong circumstantial evidence of recklessness.  *ECA, Local 134 IBEW Joint Pension Tr. Of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142) (2d Cir. 2001) (internal quotation omitted)).

### a.   The Individual Defendants

Plaintiffs' allegations also fail to create a strong inference that any of the Individual Defendants consciously misbehaved or demonstrated a reckless disregard with respect to the Company's Press Release or Blanford and Rathke's PowerPoint. Plaintiffs present no particularized allegations of instances in which the Individual Defendants were provided with information that would put them on notice that they were reckless in issuing the statements in the Press Release or the PowerPoint.  The CW statements suggest that the Individual Defendants were present

27

at meetings where the limitations of GMCR's demand planning
capabilities were discussed; however, the Amended Complaint
includes no allegations of specific reports or statements that
would have put the Individual Defendants on notice that the
Company should not rely on its demand planning system in setting
performance estimates.  Instead, Plaintiffs rely on unspecific,
conclusory allegations, such as the claim that "everyone in
these weekly meetings knew the existing demand planning system
was not accurate."  Am. Compl. ¶ 22.  In places, the Amended
Complaint is specific: for example, Plaintiffs' claim that GMCR
did not write off inventory until it hit its expiration date,
even though Company policy was not to ship any inventory unless
its expiration date was at least five months away.  *Id.* ¶¶ 32,
34.  But Plaintiffs do not identify specific reports or
statements that would have brought these issues to the attention
of the Individual Defendants.  *See Novak*, 216 F.3d at 309
("Where plaintiffs contend defendants had access to contrary
facts, they must specifically identify the reports or statements
containing this information.").  And even if the Individual
Defendants did receive specific reports containing that
information, it is hardly self-evident that knowledge of the
company's inventory recognition practices in 2010 would
necessarily have put them on notice that the statements issued

by the Company in 2012 were false or misleading.[11]  For these reasons as well as those discussed above, Plaintiffs have not met the requirements for pleading scienter with respect to the Individual Defendants.

### b.   GMCR

To plead GMCR's scienter, Plaintiffs may allege facts creating a "strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter," even if that person is not one of the Individual Defendants. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008).  Most relevant here are Plaintiffs' allegations concerning Wettstein, GMCR's Vice President of Supply Chain Operations.  According to Plaintiffs, Wettstein had direct knowledge of the problems with GMCR's demand planning system because CW3 reported, albeit indirectly, to him.  *See* Am. Compl. ¶ 20.  Plaintiffs also allege that CW3 quit GMCR in April 2010 after Wettstein and Holly asked her to break the rules for quarterly revenue recognition.  *Id.* ¶ 29. Yet as the Court has already explained above, Plaintiffs'

---

[11] In an apparent attempt to bridge the time that passed between CW3's departure and the Class Period statements, Plaintiffs include the allegation that CW3 was in contact with GMCR employees after her departure and that as recently as October 2012, one of them told her that GMCR had not fully implemented a new demand planning system and that neither the old nor the new system was accurate.  Am. Compl. ¶ 25.  Nonetheless, Plaintiffs fail to identify any specific reports or statements between CW3's departure and the Class Period that would have put the Individual Defendants on notice that their statements were materially false.

allegations about Wettstein's knowledge in 2010 do not support a
strong inference that he or other GMCR employees had reason to
know that that the Class period statements were false.  Thus,
even if Wettstein's knowledge is imputed to GMCR and is
considered in conjunction with Plaintiffs' other allegations, it
does not create a strong inference that GMCR was reckless with
respect to the veracity of the comments in the Press Release and
the PowerPoint.

### 3.   *Tellabs* Analysis

The combined facts amounting to an inference of scienter
must be "at least as compelling as any opposing inference of
nonfraudulent and nonreckless intent."  *S. Cherry St.*, 573 F.3d
at 111.  GMCR's SEC filings demonstrate that it underwent a
period of rapid growth between 2010 and 2012.  The Company's
quarterly net sales increased from approximately $350 million in
the first quarter of 2010 to over $1.15 billion in the first
quarter of 2012.  *See* GMCR 2012 Form 10-K, at *117, ECF No. 32-
3; GMCR 2010 Form 10-K, at *120, ECF No. 32-4.  That GMCR would
face challenges anticipating demand and tracking its expired
inventory during a period of such rapid expansion is hardly
surprising.  In fact, Blanford acknowledged as much in the Press
Release when he mentioned "the challenge of estimating sales in
such a dynamic environment" and explained to investors that the
Company would be "working to ensure [that it] appl[ied]

appropriate rigor and analyses to confirm and refine [its] modeling assumptions and estimates of forward demand."  Press Release at *4.  The Amended Complaint and relevant SEC filings give rise to the inference that GMCR presented investors with relatively cautious predictions about its future performance. Ultimately, GMCR's sales performance for the second quarter of 2012 was slightly lower than expected, which led the Company to revise its earnings-per-share estimates for the year. Nonetheless, the predictions GMCR issued in its Class Period statement were based on financial data that have neither been restated by the Company nor challenged—at least not directly—by Plaintiffs.  The Court is persuaded that an innocent reading of the facts is more compelling than the sinister one advanced by Plaintiffs.  For that reason, as well as those stated above, Plaintiffs have failed to state a 10b-5 claim against any of the Defendants.

## IV.  Plaintiffs Have Not Pled Sufficient Facts to Satisfy the Group Pleading Doctrine With Respect to Stiller

Stiller seeks dismissal for an additional reason: he claims that the Plaintiffs have not identified a material misstatement that he made.  As noted above, the Amended Complaint identifies two sets of statements, neither of which involved Stiller directly.  Plaintiffs rely on the group pleading doctrine, which allows litigants "to rely on a presumption that statements in

31

prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *Warchol*, 2012 WL 256099 at *5 (internal quotations omitted).[12]  For the doctrine to apply, the Amended Complaint must contain particularized allegations of Stiller's participation in the daily business of the company, *id.* at *6, but it falls well short of that standard.  The Amended Complaint simply states that Stiller was the founder of GMCR and the chairman of its board during the Class Period.  It does not allege that Stiller participated in the daily business of the Company or in creation of any of the statements Plaintiffs identify.  The Amended Complaint therefore must be dismissed with respect to Stiller for the independent reason that it fails to allege that he made a materially false statement.

**V.   Plaintiffs' Claim Against the Individual Defendants For Control-Group Liability Also Fails**

Without an underlying violation of a securities law, Plaintiffs cannot sustain a Section 20(a) claim against the

---

[12] As the Court noted in *Warchol*, it is unclear whether the group pleading doctrine is consistent with the PSLRA.  *Id.* at *5 n.9.  *See also Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011) ("[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

Individual Defendants, so that claim must also fail.  *See*

*Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir. 1998).

**CONCLUSION**

For the reasons stated above, the Court grants Defendants'

motions to dismiss the Amended Complaint without prejudice.  *See*

*Acito,* 47 F.3d at 55 ("Leave to amend should be freely granted,

especially where dismissal of the complaint was based on Rule

9(b)."").  Plaintiffs therefore have thirty days from the

issuance of this order to file an amended complaint.

Dated at Burlington, in the District of Vermont, this 26th

day of September, 2013.


/s/William K. Sessions III
William K. Sessions III
U.S. District Court Judge